DONLEY v. FOWLER.

1. REPLEVIN—BOND—SUFFICIENCY—AMENDMENT.
   A writ of replevin for distrained beasts will not be quashed and the suit dismissed because plaintiff gave an indemnity bond instead of a replevin bond, where he supposed he had given a proper bond and does file a proper bond on being given opportunity to do so. Sections 10409, 10410, 3 Comp. Laws. GRANT and CARPENTER, JJ., dissenting.

2. ANIMALS—RUNNING AT LARGE—IMPOUNDING—EVIDENCE — SUFFICIENCY.
   In an action of replevin for impounded cattle, evidence as to whether they were running at large when taken up by defendant examined, and held, by a divided court, that the question was one for the jury.

Error to Hillsdale; Chester, J. Submitted October 17, 1906. (Docket No. 15.) Decided March 5, 1907.

Replevin by William Donley against Durell Fowler. There was judgment for plaintiff, and defendant brings error. Affirmed by divided court.

*F. A. Lyon*, for appellant.

*Frankhauser & Cornell*, for appellee.

MOORE, J. This is an action of replevin brought to recover the possession of distrained beasts. The case was tried by a jury, which returned a verdict in favor of plaintiff. The case is brought here by writ of error. The record is a long one, containing 46 assignments of error. They have all had our attention, but we do not deem it necessary to discuss them all.

The plaintiff has 57 acres of land where he lives. He also has 40 acres of land used chiefly for pasturage. The farm of defendant separates the two tracts of land owned by the plaintiff. The method of getting from one tract of land to the other is by the use of the public highway. Not far from the dooryard of plaintiff there is a running stream of water in the highway, at which plaintiff's cattle were accustomed to drink when on the way from the home farm to the pasture farm. It is the claim of plaintiff that one morning in June six cows after being milked were turned into the highway from the barnyard for the purpose of being taken to the pasture. They were accompanied by one calf; that within five minutes after they were turned into the highway they were taken by the defendant into his inclosure.

Defendant claimed the cattle were running at large, and had been permitted to do so, and that no one had charge of them. Plaintiff further claims he made a demand for the cattle, which demand was refused unless he would pay 50 cents a head for them. This he declined to do. He sued out a writ of replevin, which was delivered to the sheriff. The writ was served, the sheriff making a return thereon, among other things, as follows:

" And I do further return that afterwards, on the 19th day of June, 1905, I delivered the goods and chattels, so replevined, to the within named William Donley, the said William Donley having first executed and delivered to me the requisite bond under the statute, with L. B. Wolcott and Ralph W. Hayes, of the city of Hillsdale, in said county, as sureties."

The defendant moved to quash the writ and for a discontinuance of the case for several 'reasons, and other proceedings were had, which it is not material to set out here. On the hearing it was made to appear that the bond which was given was not a replevin bond, but the indemnity form of a bond was used. The circuit judge was satisfied that plaintiff had attempted to give the proper bond, and supposed he had done so. Against the objection of defendant plaintiff was allowed to file a new bond. Later the case was tried with the result before stated.

Defendant claims:

" 1. That no valid service was made of the writ of replevin, and therefore that the court obtained no jurisdiction to hear, try and determine the case.

" 2. That upon the trial of the case there was manifest error in the rulings of the court on the admission and rejection of testimony.

" 3. That by the undisputed testimony in the case—by plaintiff's own showing—the cattle were running at large at the time they were impounded, within the purview of the statute, and the court should have directed a verdict for the defendant.

" 4. That in any event the court's charge as given did not properly guard the rights of the defendant, and did not correctly state the law as applicable to the case."

Counsel quotes the statute (3 Comp. Laws, § 10707):

" The writ shall be served, and the property shall be appraised, and before delivery thereof to the plaintiff, a bond shall be given in like manner, and with the same effect as in other cases of replevin; but such property shall not be removed by the officer until such bond shall be given; and if such bond be not given within the time limited for that purpose, the property shall be relinquished by the sheriff and such failure shall be deemed a discontinuance of the suit by the plaintiff "—and contends that it is mandatory.

He concedes that if the bond had simply been defective it might have been amended under the ruling in *Bublitz* v. *Trombley*, 113 Mich. 414. He insists, however, that

the bond which was given was not a replevin bond at all, but was an indemnity bond, and that the court was without jurisdiction to make any order in the case. Justice MONTGOMERY, speaking for the court, in *Bublitz* v. *Trombley,* supra, said that, in construing the statute above quoted, account should also be taken of the provisions of section 10410, 3 Comp. Laws. He used language indicating that, where a proper bond had not been given, plaintiff might be given the opportunity to file such a bond as the statute required. A reference to sections 10409 and 10410, 3 Comp. Laws, will show the language used is very broad. In the first of these sections it is said:

"Whenever a bond is or shall be required by law to be given by any person, in order to entitle him to any right or privilege conferred by law, or to commence any proceeding," etc.

In the following section it is said, "Whenever such bond," and it then provides what may be done. We think the trial judge was well within these provisions of the statute when he permitted a new bond to be filed.

The other important question is raised by counsel's requests to charge. It will be sufficient to quote three of them:

"13. Upon this branch of the case, I charge you that the only real issue of fact is as to whether these cattle were running at large upon this highway at the time in question. If so, then your verdict must be for the defendant. As to this, I charge you that 'running at large' upon the highway, within the meaning of our law, means strolling without restraint or confinement; as wandering, roving, or rambling at will unrestrained.

"14. In order to be under restraint, within the meaning of this law, there must be some one sufficiently near to restrain them from doing damage. And unless there was some one sufficiently near to these cattle at the time in question to restrain them and keep them from doing damage, they were running at large within the meaning of this statute.

"15. In this case I charge you that by the undisputed

evidence these cattle were running at large, within the meaning of our law, and your verdict must be for the defendant."

The judge declined to give these requests, but charged the jury:

"I will define what is meant in the law by running at large. Running at large means strolling without restraint or confinement, as rambling, roving, or wandering at will, unrestrained; that is, without any one to hinder or direct them. Of course, in this case, gentlemen, you must understand that this strolling or rambling or roving or wandering must be in the public highway. To be under restraint, it is not necessary that some one be in front of the cattle, and some one following at the heels of the cattle. It is enough if some one, either the owner or some one hired by him, was keeping them in view, and was sufficiently near and ready to restrain them if they were about to do damage.

"Then, gentlemen, if you find that these cattle were running at large on the 16th day of June in the public highway in front of defendant's premises, that is, that they were strolling along without any restraint or confinement, and that there was no one watching them and keeping them in view who was sufficiently near and ready to restrain them if they were about to do damage, then you will find for the defendant.

"On the other hand, if you find that these cattle were on this highway for the purpose and intention of in due time taking them on further to pasture, and that they were in plain view of the plaintiff or some members of his family who were watching them for the purpose of taking ing them to pasture, and that the person who was watching them was sufficiently near and was ready to restrain them if they were about to do damage, then you will find for the plaintiff."

Counsel contends that under the undisputed testimony the cattle were "strolling without restraint or confinement, as wandering, roving, or rambling at will, unrestrained," and were running at large within the meaning of the statute—citing *Bertwhistle* v. *Goodrich*, 53 Mich. 457; *Blanck* v. *Hirth*, 56 Mich. 330, and many other cases. Before deciding whether counsel is right in

this contention, it is necessary to consider some of the testimony offered on the part of the plaintiff. It has already appeared that plaintiff claimed the cows were turned into the highway for the purpose of being taken to the pasture. Mrs. Donley testified:

" On the 16th of June, last, we were milking six cows. I did the milking both night and morning. * * * On the morning in question there were six cows and one calf turned out in the road. * * * These cows were being pastured on this 40 acres of land that we have west of Mr. Fowler's house. * * * They had been running there about six weeks at that time.

" *Q.* What was your habit about taking these cows back and forth—who did it?

" *A.* Well, different ones of the family; sometimes it was the little boy, sometimes the older boy, sometimes I did, and sometimes Mr. Donley. * * * When the boy went to school he would drive them—that was on his way to school. They got accustomed to going back and forth to that 40 acres, so that they would go in that direction themselves. When they would get down to that corner 20 rods south of our house, they would go down into the creek and drink, and then they would go on. * * * There was some wood in the yard that I wanted piled back of the house, and I told the boy to turn the cows out and I would drive them, as I was going up there anyhow, and he did so, and he was to pile this wood. * * * The boy let them out and came in and told me. He said: 'Now, the cows I have let out, and you take them;' and I said: 'All right, I'm ready,' and I went to take them, and, as I went past the couch, the baby sat on the couch, and reached for me. Of course, he didn't reach me, and he fell, and I stopped to quiet him a few minutes, not more than a minute, I am certain. I took him out on the stoop and nursed him, and I watched the cows as they turned the corner and saw them as they went down into the creek, and then they were out of my sight for awhile, and I went into the house with him and staid a minute or so longer in the house, and gave him over to one of the children, went out into the road to take them, and I saw this Durell Fowler driving them up the road. They had got a little past where I had last seen them. * * * He took them out of the highway. They were not on his premises.

"*Q.* Now, were those cows at any time all out of your sight for any considerable time?

"*A.* Not for any length of time.

"*Q.* State whether or not they were under your eye all the time?

"*A.* Well, when they were down in the water I couldn't see them; but as they came up out of the water I could. If they had been on his premises, I could have seen them. I saw them when they got to the corner, I saw them turn the corner. After they got past the hollow where they drank, I didn't see them until I saw him taking them up the hill.

"*Q.* Now, how long would you say to the jury that it was between the time when the boy told you, 'Now, mother, I have let the cows out, and you go and take them,' until you saw Durell Fowler drive them up the road?

"*A.* Well, I should say somewhere near about five minutes. Those cows were not out of my sight more than a minute when I saw Durell Fowler taking them up."

The plaintiff and his son corroborated this testimony. A reference to the Michigan cases cited by counsel for appellant will show that, so far as they are an authority in this case, it is in favor of the claim of plaintiff. The defendant denied the truth of many of the statements made by the plaintiff's witnesses. We think it cannot be said, in view of this contradictory testimony, as a matter of law, that the cattle were running at large within the meaning of the statute. An instructive case is *Eklund* v. *Toner*, 121 Mich. 687. See, also, *Russell* v. *Cone*, 46 Vt. 600; *Elliott* v. *Kitchens*, 111 Ala. 546 (33 L. R. A. 364); *Wright* v. *Clark*, 50 Vt. 130; *Thompson* v. *Corpstein*, 52 Cal. 653.

Judgment is affirmed.

McALVAY, C. J., and BLAIR and MONTGOMERY, JJ., concurred with MOORE, J.

GRANT, J. The parties to this suit are farmers living near each other. Defendant distrained seven of the plaintiff's cattle, claiming that they were running at large in

the public highway, opposite defendant's premises, contrary to the statute. Plaintiff, claiming that they were not running at large, brought this action of replevin to obtain possession. He obtained a verdict and judgment.

The statute provides a special remedy for replevying distrained beasts and excludes any other action for obtaining possession. *Cox v. Chester*, 77 Mich. 494, and cases cited. The statute (section 10707, 3 Comp. Laws) requires the plaintiff in replevin to give a bond—

"In like manner and with the same effect as in other cases of replevin; but such property shall not be removed by the officer until such bond shall be given; and if such bond be not given within the time limited for that purpose, the property shall be relinquished by the sheriff, and such failure shall be deemed a discontinuance of the suit by the plaintiff."

No such bond was given. Plaintiff gave to the sheriff only an indemnity bond to protect the sheriff against costs, damages, etc., incurred by him (the sheriff) in the suit. Defendant moved for a discontinuance of the suit under the above statute, for failure to give the required bond. His motion was denied, and the court permitted plaintiff to file a new bond.

1. I think the action of the circuit court is not authorized by the statute of amendments. There is not a sentence in the bond which shows that it was intended as a bond provided by the statute. It was not a defective bond subject to amendment. So far as protecting the rights of the defendant under the statute, it was as worthless as a deposit of money by the plaintiff with the sheriff to protect him from damages and costs, or a promissory note or any other obligation given for the same purpose. The statute could only be complied with by giving an entirely new bond, different entirely in terms, from the one which the sheriff took. The effect of the bond cannot be determined by the intention of the sheriff or the plaintiff. It must speak for itself. The question is, Did the plaintiff give any bond contemplated by the statute as a pro-

tection to the defendant, and essential to plaintiff's right to maintain the suit ? It seems to me clear that he did not. After defendant's motion was overruled the question was properly raised by a plea upon which issue was joined, evidence taken, and the plea overruled.

Counsel for the plaintiff insist that this case is controlled by *Bublitz* v. *Trombley*, 113 Mich. 413. The sole question in that case was whether the filing of a proper bond was waived. The bond was in compliance with the statute, except that it had only one surety instead of two. There was, therefore, a bond showing upon its face an attempted compliance with the statute, which made it a proper subject of amendment. All the amendment required was the addition of another surety. In this case the bond in no respect complied with the statute. Counsel for the plaintiff discuss the hardship to the plaintiff if his suit must go down because he filed no bond. This is not a case for the application of sympathy, for plaintiff, under his own testimony, might have obtained his cattle back upon payment to defendant of $1, less than one-third the statutory penalty, but he preferred a lawsuit.

2. Were plaintiff's cattle running at large contrary to the statute, which says—

"It shall be lawful for any person to seize and take into his custody and possession any animal which may be in any public highway, and opposite the land owned or occupied by him, contrary to the provisions," etc.? 2 Comp. Laws, § 5608.

The undisputed facts are that plaintiff's son turned the cattle from his yard into the highway, and left them without any one in charge to drive them to the pasture, along the public highway, opposite the defendant's farm. To all appearances there was no one in control, or in sight of them, to watch them. A neighbor and his son drove by with a horse and buggy and saw no one. Their horse shied, being somewhat frightened by the cattle. The only pretense that one was in charge of them was that the wife of the plaintiff was in her house attending to her

household duties, attempting to keep the cattle in view. Meanwhile they had roamed along the public highway about 20 rods, to the turn of the road, and had gone about 5 rods farther to the creek—where they usually drank, and where they were out of sight of plaintiff's wife—and then went 15 to 20 rods farther, opposite defendant's premises. According to plaintiff's evidence, it was about five minutes from the time they left plaintiff's yard until they were distrained by the defendant. According to defendant's evidence it was about half an hour. The question of time is immaterial. The fact remains that these cattle went unattended and unrestrained, roaming at their will for about 40 rods, until they were opposite the defendant's premises. Who was there to prevent them from trespassing upon the defendant's premises in sufficient time to prevent damages? Could the plaintiff's wife, the only one who plaintiff claims was left in charge of them, run 40 rods in time to prevent damage? Manifestly these cattle were unrestrained and running at large, with no one sufficiently near to control them.

The court instructed the jury:

" To be under restraint it is not necessary that some one be in front of the cattle, and some one following at the heels of the cattle. It is enough if some one, either the owner or some one hired by him, was keeping them in view, and was sufficiently near and ready to restrain them if they were about to do damage.  *  *  *

" If you find that these cattle were on this highway for the purpose and intention of in due time taking them on further to pasture, and that they were in plain view of the plaintiff or some members of his family who were watching them for the purpose of taking them to pasture, and that the person who was watching them was sufficiently near and was ready to restrain them if they were about to do damage, then you will find for the plaintiff."

It is a fair inference from the instruction of the court, considered as a whole, that the intention of the plaintiff was controlling. His intention under the facts of this case was wholly immaterial. Under the defendant's evi-

dence the cattle were in the highway unattended for half an hour. Under the court's instruction the jury might have found that half an hour was due time for plaintiff's wife to carry out her " intention of taking them further." We are not dealing with a case where one's cattle are upon the highway without the owner's knowledge or consent, as where some third person may have opened a gate or taken down a fence and driven them into the highway, or, where a windstorm has blown down a legal fence through which the cattle have entered upon the highway. We are dealing with a case where the cattle were *intentionally* turned into the highway, and left to go unattended for 40 rods or more. Suppose defendant had no fence along the highway—and the law does not require him to fence—would these cattle have been running at large ? Does the statute contemplate that, with no fences along the highway, or with poor fences, a party may turn his cattle in the highway, "intending in due time " to drive them along the highway, as he has a perfect right to do, and then say that he has them under control when they have gone 40 rods unattended, with a woman in the house as the sole person to watch or keep them from trespassing ? The plaintiff, evidently in order to prejudice the jury against the defendant, was permitted erroneously to introduce evidence that the defendant's fences were in bad condition. This error may possibly have been cured by the instruction of the court that the defendant was under no obligation to fence his land along the highway. If his fences were in bad condition, or if there were no fences, all the greater the necessity that plaintiff should closely follow his cattle along the highway to the pasture.

Counsel for the plaintiff rely upon *Eklund* v. *Toner*, 121 Mich. 687. I have read the record and briefs in that case, and it appears from them, as well as from the opinion, that the issue was not framed, nor was the case tried, under the statute. No testimony was given in the case with the view to determine whether the cattle were running at large. The only testimony was that the people there

were in the habit of turning their cattle into the highway
to feed upon a common not far away, and, in opening the
defendant's case to the jury, defendant's attorney express-
ly stated, in reply to a question by the court, that they did
not claim under the statute.   The record does not show
what supervision Mr. Eklund exercised over the cattle or
how near he was to them.   The court expressly refused to
submit any such question to the jury.   Mr. Toner claimed
that he took the cattle damage feasant, but Mr. Eklund
claimed that Mr. Toner drove them from the highway in-
to his field, where the damage was done.   On these two
claims the case was submitted to the jury.   This question
was therefore not in that case, and what we then said is
dictum.   It was not necessary to a decision of the case.
The difficulty experienced by the jury under this instruc-
tion is manifest from the fact that after a while they re-
turned into court and asked:

" How far cattle shall be, and what situation they shall
be in, in order to be out of the restriction of the owner, or
the one who is supposed to.

" *The Court:* Well, I defined that to you, gentlemen,
in the charge.   Is it the charge that you do not under-
stand ?

. " *The Foreman:* Yes, sir."

The court then repeated that part of the charge above
quoted.   So far as controlling the cattle or preventing
trespass and immediate damage, Mrs. Donley might as
well have been a half a mile distant as to have been 40
rods.   If plaintiff had thus turned his cattle into a street
of a populous community, where there were houses and
yards every few rods, would they have been under his
control after they had strayed 40 rods, while his wife sat
in the house or on the porch pretending to watch them ?   It
was shown to have been the common thing for the plain-
tiff to let his cattle, horses, hogs, and sheep run at large
in the public highway.   This testimony was competent.
*Decker* v. *McSorley*, 111 Wis. 91.   To such an extent
was this done that plaintiff admitted that most of his

neighbors were his enemies.  See *Shipley* v. *Colclough*, 81 Mich. 625; *Robinson* v. *Railway Co.*, 79 Mich. 323; *O'Mally* v. *McGinn*, 53 Wis. 353; *Hinman* v. *Railroad Co.*, 28 Iowa, 491.

I think the judgment should be reversed, and the suit quashed with the costs of both courts.

We think this record unnecessarily long.  There was testimony offered which the court would have been justified in excluding on its own motion.  We think a record half the length would have been sufficient for a proper presentation of all the questions raised.  For this reason only one-half costs for printing the record should be allowed.

CARPENTER, J., concurred with GRANT, J.

OSTRANDER and HOOKER, JJ.  We concur upon the point last discussed, being point No. 2